

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00203-CR

———————————————

BILLY CHARLES WHATLEY, Appellant

V.

THE STATE OF TEXAS

———————————————

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CR23494

———————————————

Before Kerr, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I.  INTRODUCTION

Appellant Billy Charles Whatley pleaded guilty to two counts of sexual assault against his friend and former lover, C.C.[1]  A jury assessed his punishment at five years' confinement on each count, and the trial court sentenced him accordingly, with the sentences to run concurrently.  In two issues on appeal, Whatley complains that he should have been allowed to withdraw his guilty plea and that his two convictions for sexual assault violate double jeopardy.  We will hold that Whatley has not preserved his complaint regarding the withdrawal of his guilty plea because he did not seek the withdrawal of his plea in the trial court.  We will further hold that Whatley has not preserved his double-jeopardy complaint because he did not raise it in the trial court and a double-jeopardy violation is not clearly apparent from the face of the record.  Accordingly, we will affirm the trial court's judgment.

## II.  BACKGROUND

### A.  Whatley's Relationship with C.C.

Whatley and C.C. met in or around 2011.  As explained by C.C., she and Whatley were "best friends nonstop," and they were also "on-and-off lovers."  In or around 2020, Whatley informed C.C. that he had the human papilloma virus (HPV), a sexually transmitted infection.  After Whatley disclosed that information to C.C., she

---

[1]To protect the complainant's anonymity, we will use her initials to refer to her. *See McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

told him that she no longer wanted to have a romantic relationship with him. C.C. also informed Whatley that she had met another man and intended to spend the rest of her life with that man but that she still wanted to be "best friends" with Whatley.

## B. Whatley's Sexual Assault of C.C.

Whatley had a daughter—Vivian[2]—from a previous relationship. C.C. and Vivian shared a close bond. Vivian would refer to C.C. as "her other mom," and C.C. would visit Vivian "[a]t least every other weekend."

On June 5, 2021, C.C. visited Vivian at Whatley's residence.[3] According to C.C., she had told Whatley that she was visiting to "see [Vivian] and [Vivian] only" and that she "was not there for anything with him sexually." Whatley indicated that he was "okay with that." Notably, C.C. was nine weeks pregnant when she visited Vivian, and Whatley knew that C.C. was pregnant. In the evening of the visit, C.C. and Vivian started watching a movie together in the bedroom that Vivian shared with Whatley. During the movie, both C.C. and Vivian fell asleep—C.C. in Whatley's bed and Vivian in a "toddler bed at the foot of [Whatley's] bed."

C.C. later woke up to use the bathroom, and she realized that her bra was undone. She clasped her bra and went back to sleep. She later woke up because of

---

[2]Whatley's daughter was six years old when he sexually assaulted C.C. To protect the anonymity of Whatley's daughter, we will use an alias to refer to her. *See* Tex. R. App. P. 9.10(a)(3).

[3]Whatley and Vivian shared the residence with another family.

her "internal clock," and when she did, Whatley laid his head on her stomach. C.C. thought this was "adorable" because she assumed that Whatley wanted to listen to her unborn baby or feel movement from the unborn baby. Instead, according to C.C., Whatley "reached down" and touched her "crotch." C.C. testified that she then pushed Whatley's hands away and told him that she "did not want any sexual relations." C.C. stated that Whatley attempted to touch her "crotch" again, and she again pushed his hands away.

As recounted by C.C., Whatley then "forcefully removed" her pants, grabbing the front of them and pulling them down.[4] C.C. testified that Whatley then "went down" on her, putting his mouth on her vagina. C.C. stated that she begged Whatley to stop, but he did not. According to C.C., Whatley later "stopped, and he came up and used his weight against [her] arms where [she] couldn't push him away." C.C. testified that while Whatley was on top of her, he "forced himself inside of [her]," placing his "genitals" in her "female sexual organ." According to C.C., she "begged him to stop" and "told him [she] didn't want it," but Whatley did not stop. Instead, Whatley ejaculated inside of her. Whatley then went to the bathroom, and C.C. got dressed and left.[5]

---

[4]C.C. stated that she was wearing "a pair of yoga pants and a spaghetti-strapped tank top" when she went to sleep that night—the same clothes she had been wearing when she had arrived at Whatley's home.

[5]C.C. testified that Vivian remained asleep while the sexual assault was occurring.

4

## C. The Events Following the Sexual Assault

After she left Whatley's residence, C.C. called two of her friends to report what had happened between her and Whatley. She also exchanged text messages with Whatley.[6] In those messages, Whatley apologized for what had happened and stated that he had "really f***ed up." C.C. told Whatley in the messages that he needed to contact her boyfriend to tell him what had happened. Whatley asked C.C. whether they could instead just "keep this within us."

Later that day, C.C. reported the sexual assault to the Wise County Sheriff's Department. Deputies from the Sheriff's Department and an investigator spoke with Whatley at his residence later that night. Whatley admitted to the investigator that C.C. had said "no" during the sexual assault. The Sheriff's Department requested that C.C. go to the hospital to be examined by a sexual assault nurse examiner (SANE). Vaginal swabs were taken during the SANE exam. Testing on those swabs revealed the presence of semen inside of C.C.'s vagina. A forensic DNA report was admitted during the punishment phase of Whatley's trial. That report reflected that Whatley was the source of the semen found inside of C.C.[7]

---

[6] C.C. testified that these text messages were exchanged "within an hour" of her leaving Whatley's residence. She also stated that her calls to her friends were happening around the same time. Copies of the text messages were admitted during the punishment phase of Whatley's trial.

[7] Several months after the assault, C.C. claims she was diagnosed with HPV. C.C. testified that she did not have HPV prior to the sexual assault. At trial, C.C. also told the jury that she had been diagnosed with cervical cancer after the assault.

5

In June 2023, C.C. sent a message to Whatley through Facebook in which she stated, "I'm probably not supposed to talk to you, but I am sorry for my actions. I was hurt and scared, [and] I ask for your forgiveness for me going to the police station."[8] She also stated, "I miss my best friend[,] and I'm not scared of you just hurt by what happened." During Whatley's trial, C.C. stated that she had written the message because she was sorry that Whatley was losing custody of Vivian because of the sexual-assault investigation. She explained that the message did not express that she had consented to the sexual activity or misled Whatley regarding the activity but that it only expressed that she was sorry that Whatley was "losing Vivian."

## D. Procedural History and Whatley's Trial

Whatley was indicted on two counts of sexual assault. The first count alleged that Whatley had knowingly caused C.C.'s sexual organ to contact his mouth without her consent. The second count alleged that Whatley had knowingly caused C.C.'s sexual organ to contact his sexual organ without her consent.

Whatley pleaded guilty to both counts of sexual assault. He requested that the jury assess his punishment, and a trial on punishment ensued. During that trial, C.C. testified about the sexual assault. Following C.C.'s testimony, a prosecutor mentioned

---

Whatley testified that C.C. had been diagnosed with cervical cancer prior to the sexual assault, stating that C.C. had told him about the diagnosis in 2017 or 2018.

[8]That Facebook message was admitted during the punishment phase of Whatley's trial.

6

on the record that Child Protective Services had done a DNA test on C.C.'s child—the child she had been pregnant with when she was sexually assaulted by Whatley. The prosecutor stated that the DNA test had revealed that the father of the child was not C.C.'s boyfriend, as C.C. had believed, but that the father was a different man.

Whatley's counsel stated that he had not been informed of that information and that he thought that "we have a Brady violation because it would be exculpatory in the sense that we don't know whether [the baby's father] has HPV." As to a remedy for that alleged violation, Whatley's counsel stated, "The only remedy I'm asking for is that we . . . put [C.C.] back on the stand for the limited purpose of inquiring into whether she – who is the father of the baby." Whatley's counsel further stated, "[O]therwise, we're going to have to ask for a mistrial. We don't want to do that, but I think I'm entitled to ask the witness about something the State's known about for some period of time." The State indicated that it did not object to Whatley's counsel's request to recall C.C., and the prosecutor stated that he had only known about the information for "[o]ne day." The trial court allowed Whatley's counsel to recall C.C., and Whatley's counsel did so, asking her questions about the paternity of her child, among other things.

The State rested, and Whatley testified on his own behalf. During his testimony, Whatley reiterated that he had pled guilty to the two counts of sexual assault, stated that he felt bad about what had happened, and admitted that he had committed the sexual assaults without C.C.'s consent. After both sides rested and

7

closed, the jury assessed Whatley's punishment at five years' confinement on each count. The trial court sentenced Whatley accordingly, with the sentences to run concurrently. This appeal followed.

## III. DISCUSSION

## A. Whatley's Complaint Regarding His Guilty Plea

In his first issue, Whatley argues that he "should have been afforded an opportunity to withdraw his guilty plea once the State's violation of *Brady* and [Article] 39.14 was made aware to the trial court because it was made involuntarily and unknowingly due to the violation."[9]

### 1. Applicable Law Regarding Preservation

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). Further, the party must obtain an express or implicit adverse trial-court ruling or object to the trial

---

[9] *See* Tex. Code Crim. Proc. Ann. art. 39.14; *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). Under *Brady*, "the State has a constitutional duty to disclose to a defendant material, exculpatory evidence." *Pena v. State*, 353 S.W.3d 797, 810 (Tex. Crim. App. 2011); *see Brady*, 373 U.S. at 87, 83 S. Ct. at 1196–97. Under Texas Code of Criminal Procedure Article 39.14(h), the State has "an affirmative duty to disclose any relevant evidence that tends to negate guilt or mitigate punishment regardless of whether the evidence is 'material' under *Brady*." *Watkins v. State*, 619 S.W.3d 265, 277 (Tex. Crim. App. 2021); *see* Tex. Code Crim. Proc. Ann. art. 39.14(h); *see also State v. Heath*, 696 S.W.3d 677, 694–702 (Tex. Crim. App. 2024) (discussing State's discovery obligations under Article 39.14 and *Brady*).

8

court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020). Moreover, the complaint made on appeal must comport with the complaint made in the trial court or the error is forfeited. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009).

A defendant who pleads guilty has the burden of seeking the withdrawal of his plea if evidence inconsistent with guilt is introduced. *Mendez v. State*, 138 S.W.3d 334, 350 (Tex. Crim. App. 2004); *Escobedo v. State*, No. 03-18-00688-CR, 2019 WL 4020269, at *3 (Tex. App.—Austin Aug. 27, 2019, no pet.) (mem. op., not designated for publication). Indeed, a trial court has no duty to sua sponte withdraw a guilty plea if evidence inconsistent with guilt is introduced. *Mendez*, 138 S.W.3d at 339, 350; *Ridgway v. State*, No. 05-08-00493-CR, 2009 WL 1929460, at *1 (Tex. App.—Dallas July 7, 2009, no pet.) (not designated for publication); *see also Salinas v. State*, 282 S.W.3d 923, 924 (Tex. App.—Fort Worth 2009, pet. ref'd) (observing that in *Mendez*, the Texas Court of Criminal Appeals relieved the trial court of the duty to sua sponte withdraw a defendant's guilty plea when evidence of innocence is introduced during a jury trial on punishment). A defendant who fails to seek withdrawal of his guilty plea "may not complain for the first time on appeal that the trial court did not do it for him." *Mendez*, 138 S.W.3d at 350; *see Duff v. State*, No. 02-11-00241-CR, 2013 WL 1457833, at *1 (Tex. App.—Fort Worth Apr. 11, 2013, no pet.) (mem. op., not designated for publication).

## 2. Analysis

Here, Whatley did not ask the trial court to withdraw his guilty plea. Instead, when he learned of the purported discovery violation, he requested that the trial court give him the opportunity to recall C.C. so that he could ask her questions relating to the paternity of her child. Whatley's counsel made it clear that recalling C.C. was the "only remedy" he was asking for. The trial court granted that remedy, allowing Whatley's counsel to recall C.C. and ask her further questions, including questions relating to the paternity of her child. Whatley made no further complaint to the trial court regarding the issue, and he made no complaint to the trial court regarding the issue he now raises on appeal—that his guilty plea should have been withdrawn because it was involuntarily and unknowingly made.

Based on this record, we hold that Whatley has not preserved his complaint regarding his guilty plea because he did not request that the trial court withdraw his plea.[10] *See Escobedo*, 2019 WL 4020269, at *4 (holding that appellant "failed to preserve . . . his complaints that the district court did not withdraw [his guilty] plea sua sponte and that his plea was involuntary" when appellant failed to seek to withdraw his guilty plea in the trial court and failed to raise a complaint in the trial court regarding the voluntariness of his plea); *Diaz v. State*, No. 10-15-00324-CR, 2016 WL 4498783, at *3 (Tex. App.—Waco Aug. 24, 2016, pet. ref'd) (mem. op., not designated

---

[10]We note that Whatley did not file a motion for new trial.

10

for publication) ("Here, appellant did not timely request that the trial court withdraw his guilty plea. In fact, he first raises this contention on appeal. As such, we conclude that appellant has forfeited his right to complain on appeal that the trial court should have sua sponte withdrawn his guilty plea."); *Duff*, 2013 WL 1457833, at \*2 ("And because Duff did not move to withdraw his guilty plea in [the underlying cause], he failed to preserve this complaint."); *Lindley v. State*, No. 08-08-00149-CR, 2010 WL 1076138, at \*5 (Tex. App.—El Paso Mar. 24, 2010, no pet.) (not designated for publication) (holding that "a defendant who asserts her guilty plea is involuntary due to the introduction of evidence inconsistent with guilt at the guilty plea proceeding must seek to withdraw her guilty plea in order to preserve the issue for appellate review"); *Nolly v. State*, No. 2-04-251-CR, 2005 WL 555215, at \*3 (Tex. App.—Fort Worth Mar. 10, 2005, no pet.) (mem. op., not designated for publication) (holding that appellant forfeited his complaint regarding the voluntariness of his guilty plea by not raising it in the trial court).

Thus, we overrule Whatley's first issue.

## B. Whatley's Double-Jeopardy Complaint

In his second issue, Whatley argues that his "two convictions for sexual assault in this single criminal action violat[e] Double Jeopardy for multiple punishments for the same offense."

### 1. Applicable Law

The Double Jeopardy Clause of the Fifth Amendment, which is applicable to the states through the Fourteenth Amendment, protects a defendant from multiple punishments for the same offense. U.S. Const. amends. V, XIV; *Brown v. Ohio*, 432 U.S. 161, 164–65, 97 S. Ct. 2221, 2225 (1977). A multiple-punishments violation of double jeopardy can occur in several different contexts. *See Littrell v. State*, 271 S.W.3d 273, 275–76 (Tex. Crim. App. 2008). For example, "two offenses may be the same if one offense stands in relation to the other as a lesser-included offense, or if the two offenses are defined under distinct statutory provisions but the Legislature has made it clear that only one punishment is intended." *Id.*

Another context for a multiple-punishments violation of double jeopardy is when a person is "convicted or punished for two offenses that are the same both in law and in fact." *Aekins v. State*, 447 S.W.3d 270, 279 (Tex. Crim. App. 2014). Under this context, "a defendant may not be convicted for a completed sexual assault by penetration and also for conduct (such as exposure or contact) that is demonstrably and inextricably part of that single sexual assault." *Id.* at 281; *see Patterson v. State*, 152 S.W.3d 88, 92 (Tex. Crim. App. 2004) (holding that appellant's exposure conviction could not stand because exposure was "incident to and subsumed by" his aggravated sexual assault of the victim by penetration). "This means that multiple convictions for one complete, ultimate sexual assault violate the Double Jeopardy Clause." *Aekins*, 447 S.W.3d at 279. However, "[a]n indecent contact that is not

12

simply preparatory to an act of penetration is itself a complete, ultimate act." *Id.* at 282.

A double-jeopardy complaint may be raised for the first time on appeal if two conditions are met: (1) the violation is clearly apparent from the face of the record and (2) the enforcement of the usual rules of procedural default would serve no legitimate state interest. *Ex parte Denton*, 399 S.W.3d 540, 544 (Tex. Crim. App. 2013); *Stephenson v. State*, 673 S.W.3d 370, 387–88 (Tex. App.—Fort Worth 2023, pet. ref'd).

Here, Whatley did not raise his double-jeopardy complaint in the trial court. We thus look to the face of the record to see if a double-jeopardy violation is clearly apparent. *See Denton*, 399 S.W.3d at 544; *Stephenson*, 673 S.W.3d at 387–88.

### 2. Analysis

Whatley was indicted on two counts of sexual assault. In the first count, the State alleged that he had knowingly caused C.C.'s sexual organ to contact his mouth without her consent. In the second count, the State alleged that he had knowingly caused C.C.'s sexual organ to contact his sexual organ without her consent. Pursuant to Section 22.011(a)(1)(C) of the Texas Penal Code, a person commits the offense of sexual assault if the person intentionally or knowingly "causes the sexual organ of another person, without that person's consent, to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor." Tex. Penal Code Ann. § 22.011(a)(1)(C).

13

Whatley contends that "[t]he events in this case were one continuous act and thus should have only been charged as a single sexual assault." We disagree. C.C. testified that Whatley first performed oral sex on her without her consent; he then "stopped, and he came up and used his weight against [her] arms where [she] couldn't push him away"; and he then inserted his penis inside of her vagina without her consent and ejaculated. That testimony establishes that Whatley committed two distinct sexual assaults against C.C.—his mouth contacting her sexual organ without her consent and his sexual organ contacting her sexual organ without her consent; thus, a double-jeopardy violation is not clearly apparent from the face of the record. *See Aekins*, 447 S.W.3d at 282 ("If the victim says Dangerous Dan raped her, then forced oral sex, then raped her again, then forced oral sex again—there are four criminal convictions possible."); *Vick v. State*, 991 S.W.2d 830, 833 (Tex. Crim. App. 1999) (holding that contact between appellant's sexual organ and victim's sexual organ was "a separate and distinct statutory offense" from contact between appellant's mouth and victim's sexual organ "despite the fact [that] both are violations of a single statute"); *Saldivar v. State*, No. 01-09-00336-CR, 2010 WL 1840240, at *5 (Tex. App.—Houston [1st Dist.] May 6, 2010, pet. ref'd) (mem. op., not designated for publication) (concluding that appellant's two convictions for aggravated sexual assault "related to two distinct acts"—the appellant's causing the victim's mouth to contact his sexual organ and the appellant's causing the victim's sexual organ to contact his sexual organ—and holding that "no double-jeopardy violation is apparent

14

from the record"); *cf. Castillo v. State*, No. 13-24-00023-CR, 2024 WL 3981178, at *3 (Tex. App.—Corpus Christi-Edinburg Aug. 29, 2024, no pet.) (mem. op., not designated for publication) ("Unlike penile contact and penetration, breast touching is not 'demonstrably and inextricably part' of vaginal or anal intercourse.").

In his brief, Whatley notes that "[t]he trial record does not indicate that there were any pauses or breaks in time between acts" and that "Whatley had a pattern of conduct with C.C. in the past in which he would perform oral sex on her before inserting himself into her." Thus, according to Whatley, the subject events should be treated as "one continuous act." We reject Whatley's contention. First, C.C.'s testimony described two distinct sexual acts: she stated that Whatley "went down" on her; then he "stopped, and he came up" to get on top of her; and then he inserted his penis inside of her vagina. The temporal proximity between those two sexual acts does not transform them into one continuous act. *See Banks v. State*, 494 S.W.3d 883, 890 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (explaining that "a person who commits more than one sexual act against the same victim may be convicted and punished for each separate act, even if these acts were committed 'in close temporal proximity'" (quoting *Loving v. State*, 401 S.W.3d 642, 650 (Tex. Crim. App. 2013) (Cochran, J., concurring))); *Bottenfield v. State*, 77 S.W.3d 349, 358 (Tex. App.—Fort Worth 2002, pet. ref'd) ("Although the two acts in T.H.'s case may have been committed during the same occurrence, appellant's touching of T.H.'s genitals with his finger was a separate and distinct criminal act from contacting her sexual organ

15

with his penis."). Second, Whatley has pointed us to no law—and we have found none—that stands for the proposition that a couple's pattern of past sexual activity involving oral sex prior to sexual intercourse somehow turns those two sexual acts into one continuous act when that pattern is later repeated without one of the parties' consent.

Having found no double-jeopardy violation apparent from the face of the record, we hold that Whatley has failed to preserve his double-jeopardy complaint. *See Denton*, 399 S.W.3d at 544; *Stephenson*, 673 S.W.3d at 387–88. We thus overrule Whatley's second issue.

### IV. CONCLUSION

Having overruled Whatley's two issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: April 10, 2025

16